IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

---

| | |
|---|---|
| BASSILA MAREGA,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>WAL-MART ASSOCIATES, INC. and<br>JOHN DOES 1 through 3, and<br>JANE DOES 1 through 3,<br><br>　　　　Defendants. | Case No. 1:08-CV-83-DAK<br><br><br>**REPORT AND RECOMMENDATION** |

---

Before the court is a motion for summary judgment filed by Defendant Wal-Mart Associates. (Doc. 43.) Defendant argues that it is entitled to summary judgment dismissal of all four causes of action asserted in Plaintiff's complaint.

Having reviewed the parties' pleadings and having heard their oral arguments, the court recommends that Defendant's motion be granted and the case be dismissed.

**BACKGROUND**

When examining a summary judgment motion, the court "'examine[s] the factual record in the light most favorable to the party opposing summary judgment.'" *Kannady v. City of Kiowa*, – F.3d –, 2010 WL 22685, at *4 (10th Cir. January 6, 2010) (*quoting Belhomme v. Widnall*, 127 F.3d 1214, 1216 (10th Cir.

1997)).  Keeping this standard in mind, the court recites the following background information.

In March 2005, Defendant offered Plaintiff an at-will hourly position as a trainee in its Management Training Program ("MTP") for assistant managers.  (Doc. 44-2, Excerpts of February 23, 2009 Deposition of Basilla Marega, at 6-7; Doc. 44-4, Defendant's Offer Letter to Plaintiff ("Defendant's Offer Letter").)  At the time Defendant recruited Plaintiff, he was a student at Utah State University pursuing his bachelor's degree in business information systems.  (Doc. 44-2 at 3-6.)  Defendant's Offer Letter to Plaintiff explicitly stated that the offer of employment and the letter "is not a contract, and your employment with the Company will be completely at will."  (Doc. 44-4, at 1.)  According to Plaintiff, Defendant explained and Plaintiff understood that he was being hired as a trainee and before he became an assistant manager he would have to participate in the MTP and successfully pass the required training, tests and evaluations.  (Doc. 44-2, at 6-7.)

On May 31, 2005, Plaintiff began his employment as an assistant manager trainee in the MTP in the Harrisville, Utah Wal-Mart store.  (Doc. 44-2, at 8-9.)  The MTP was an approximately seventeen-week program, which involved about thirteen weeks of classroom work and on-site training and a four-week "job shadowing" portion.  (Doc. 44-5, Affidavit of Gene Ann Tanner, at ¶ 3.)  The goal of the MTP is to develop a

2

potential assistant manager's leadership skills and abilities to work independently as an assistant manager.  (Doc. 44-5, at ¶ 4.) In this program, Plaintiff was expected to learn and perform the responsibilities of an assistant manager.  (Doc. 44-5, at ¶ 4; Doc. 44-2, at 10-13.)  A Wal-Mart assistant manager's duties consist of, among other things, operating cash registers, operating handheld computers called Telxons, obtaining cash for cashiers and customer service managers, interacting with customers, and building store displays.  (Doc. 44-2, at 12; Doc. 44-5, at ¶ 5; *see also* Doc. 44-5, Ex. 1, Wal-Mart Assistant Manager Job Description.)  There were seven individuals in the MTP, including Plaintiff, during the summer of 2005 at the Harrisville, Utah Wal-Mart store.  (Doc. 44-2, at 14.)

Because Plaintiff had not completed all of his classes for his degree at Utah State University, Defendant allowed Plaintiff to begin the management training classes five hours late three days a week.  (Doc. 44-2, at 15-16.)  On those occasions, Gene Ann Tanner, the MTP Trainer, stayed late working with Plaintiff and providing him with individualized instruction.  (Doc. 44-2, at 17; Doc. 44-5, Ex. 1, at ¶ 7; *see also* Doc. 44-5, Ex. 4, November 5, 2005 Tanner Statement.)  No other trainee received the same scheduling modification and lengthy one-on-one instruction from Tanner.  (Doc. 44-2, at 17.)  In her opinion, Tanner determined that Marega seemed to understand the classroom

3

written material, but had a hard time executing the lessons out on the floor.  (Doc. 44-5, at ¶ 8; *see also* Doc. 44-5, Ex. 4.)

According to Tanner, Plaintiff was timid on the front end, where the cash registers were located, from the beginning.  (Doc. 44-5, at ¶ 8.)  For example, Tanner would assign Plaintiff to a cash register and when she would leave he would just stand and watch other associates.  (Doc. 44-5, at ¶ 8; *see also* Doc. 44-5, Ex. 4.)  When he did operate a cash register, he was not proficient.  (Doc. 44-5, at ¶ 8; *see also* Doc. 44-5, Ex. 4.)  Overall, Tanner noticed that Plaintiff had a tendency to "stand back" and not participate and he did not do well taking instruction from others.  (Doc. 44-5, at ¶ 8; *see also* Doc. 44-5, Ex. 4.)

At the end of the classroom portion of the training program, Tanner completed a Management Training Program Performance Appraisal for Plaintiff.  (Doc. 44-5, at ¶ 9; *see also* Doc. 44-5, Ex. 2, Management Training Program Performance Appraisal ("Performance Appraisal").)  In the Performance Appraisal, Tanner gave Plaintiff an overall rating of 3.0, which was at the lowest end of the "valued performer" rating.  (Doc. 44-5 at ¶ 10; Doc. 44-5, Ex. 2, at 12.)  All six of Plaintiff's classmates scored higher than did Plaintiff on the Performance Appraisal.  (Doc. 44-5, at ¶ 9; Doc. 44-5, Ex. 3, Appraisal Scores Obtained by Associates Participating in MTP in 2005 Summer Session.)  On the Performance Appraisal, Tanner specifically encouraged Plaintiff

to, among other things, develop a sense of urgency, be more proactive on the front-end, show more initiative in merchandising and on the sales floor, learn cash skills, learn how to operate the Telxon, and stay on task.  (Doc. 44-5, at ¶ 10; Doc. 44-5, Ex. 2, at 11-13.)

On September 2, 2005, after completing the classroom portion of his training, Plaintiff moved to the "job shadowing" portion of the training program.  (Doc. 44-2, at 19; Doc. 44-5, at ¶ 11.) During the "job shadowing" portion of the training program, the trainee was assigned to an established assistant manager and followed, or "shadowed," that assistant manager for approximately three to four weeks.  (Doc. 44-2, at 20; Doc. 44-5, at ¶ 12.)  In this capacity, Defendant expected the trainee to demonstrate his or her leadership skills and abilities, including the ability to work independently with little guidance, while working with another assistant manager.  (Doc. 44-5, at ¶ 12.)

Defendant assigned Plaintiff to "job shadow" Randy Jones, Assistant Manager at Store 3454 in Perry, Utah.  (Doc. 44-2, at 21; Doc. 44-5, at ¶ 13.)  During the approximately four weeks that they spent together, Jones noted that Plaintiff was unable to perform the most basic responsibilities, like operating a Telxon, which is used by assistant managers on a daily basis to make price inquiries, price changes and control inventory.  (Doc. 44-5, Affidavit of Randy Jones, at ¶ 4.)  Jones also noted that Plaintiff often stood around and watched other associates perform

work rather than jump in on his own and do the work himself.
(Doc. 44-6, at ¶ 5.)  At the end of the "job shadowing" period,
Jones provided feedback regarding Plaintiff's performance to
Tanner and District Manager, Don Schulthies.  (Doc. 44-6, at ¶ 6;
*see also* Doc. 44-5, ¶ 13; Doc. 44-5, Ex. 4.)  In evaluating
Plaintiff's performance, Jones noted that Plaintiff would jump in
when told and was helpful; however, he did not initiate any
leadership or help while working in the store.  (Doc. 44-2, at
22; Doc. 44-6, at ¶ 6.)  Based upon his observations of
Plaintiff's performance during the "job shadowing" portion of his
training, Jones told Tanner and Schulthies that he did not think
Plaintiff possessed the knowledge or leadership skills necessary
to hold an assistant manager position.  (Doc. 44-6, at ¶ 7; Doc.
44-5, at ¶ 13; Doc. 44-7, Affidavit of Don Schulthies, at ¶ 4.)

     Although Plaintiff had failed to successfully complete the
"job shadowing" portion of his training, Schulthies decided to
extend Plaintiff's training and offered him another opportunity
to "shadow" another assistant manager.  (Doc. 44-7, at ¶ 5.)
Consequently, Schulthies extended Plaintiff's "job shadowing"
training period for approximately three or four weeks and
returned Plaintiff to the Harrisville store for additional
training.  (Doc. 44-2, at 23; Doc. 44-7, at ¶ 5.)

     Schulthies assigned Plaintiff to follow Mace Reddington,
Assistant Manager at the Harrisville Store.  (Doc. 44-2, at 24;
Doc. 44-7, at ¶ 5; Doc. 44-8, Affidavit of Mace Reddington, at ¶

6

3.)  Because Plaintiff was unfamiliar with the operations on the front-end, Reddington assigned Plaintiff tasks on the front-end. (Doc. 44-8, at ¶ 4.)  As a special project, Reddington asked Plaintiff to develop an action plan for the store to handle customer returns on the day after Christmas.  (Doc. 44-8, at ¶ 5.)  After spending two to three weeks with Plaintiff, Reddington left the store for a one-week vacation.  (Doc. 44-8, at ¶ 6.) When he returned from vacation, Plaintiff still had not completed the action plan.  (Doc. 44-8, at ¶ 7.)

While Reddington was on vacation, Plaintiff treated a credit card transaction as a cash transaction and, as a result, failed to charge the customer's credit card.  (Doc. 44-9, Affidavit of Sean McKuen, at ¶ 5.)  The customer received the merchandise free of charge and the register was short by $171.94.  (Doc. 44-9, at ¶ 5.)  On at least one occasion, Co-Manager Sean McKuen noted that Plaintiff refused to answer a customer service manager's request for additional cash from the cash office.  (Doc. 44-9, at ¶ 4.)

While Reddington was on vacation, Plaintiff also worked with Assistant Manager Kent Flint.  (Doc. 44-10, Affidavit of Kent Flint, at ¶ 3-4.)  Flint asked Plaintiff to reorganize a store display, a job that would take approximately one or one-and-one-half hours to complete.  (Doc. 44-10, at ¶ 4.) According to Flint, Plaintiff was unable to complete the next step of the display reorganization without explicit step-by-step

7

instructions from Flint and spent the entire day trying to reorganize the display.  (Doc. 44-10, at ¶ 4.)  Flint was surprised that it took Plaintiff nearly an entire day to complete a project that should have been completed in less than two hours. (Doc. 44-10, at ¶ 4.)  Flint also observed that Plaintiff was unable to handle customer complaints and frequently referred complaints to Flint.  (Doc. 44-10, at ¶ 6.)  Reddington and Flint informed Schulthies that Plaintiff lacked initiative and an understanding of basic assistant manager skills, such as handling cash, cashiering, building displays and handling customer complaints.  (Doc. 44-8, at ¶ 10; Doc. 44-10, at ¶ 7; Doc. 44-7, at ¶ 6.)

On October 27, 2009, Harrisville Store Manager Jeri Goulden, District Human Resources Manager Terry Graft, Schulthies, and McKuen met with Plaintiff.  (Doc. 44-7, at ¶ 7.)  During this meeting, Schulthies asked Plaintiff several basic questions about the job duties of an assistant manager, such as cashiering, building a display, handling merchandise and inventory control. (Doc. 44-7, at ¶ 7.)  In response, Plaintiff was able to provide only vague, general answers.  (Doc. 44-7, at ¶ 7.)  Based upon Plaintiff's answers, Schulthies confirmed that Plaintiff was not ready to work independently as an assistant manager.  (Doc. 44-7, at ¶ 8.)  At the meeting, Schulthies asked Plaintiff whether he would assume an hourly position to further develop his skills and learn Wal-Mart's system.  (Doc. 44-7, at ¶ 11.)  After making

several inquiries, Schulthies offered Plaintiff the customer service manager position at the Logan, Utah Wal-Mart to help familiarize Plaintiff with front-end operations.  (Doc. 44-7, at ¶ 11.)[1]  Plaintiff rejected the offer and voluntarily resigned his employment with Defendant on October 29, 2009.  (Doc. 44-7, at ¶12; *see also* Doc. 44-7, Ex. 1.)

### ANALYSIS

Summary judgment should be granted "'if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'"  *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) *quoting* Fed. R. Civ. P. 56(c)), *cert. denied*, 130 S. Ct. 259, (2009).  The moving party has "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law."  *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2003).  "'[T]he movant need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-

---

[1]According to Defendant, Schulthies also told Plaintiff that he would continue to search for a position within Plaintiff's field of information technology and business.  (Doc. 44-7, at ¶ 11.)  At the court's hearing, Plaintiff declared during his oral argument that he had no memory of the offer to search for a position within the field of information technology and business; however, in his deposition, Plaintiff testified that he was told someone would look for a job in Plaintiff's major, and that Defendant offered him a job as CSM.  (Doc. 44-2, at 31.)

movant's claim.'" *Kannady v. City of Kiowa*, – F.3d –, 2010 WL 22685, at *4 (10th Cir. January 6, 2010), *quoting Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000). "If the movant carries this initial burden, the nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Jenkins*, 81 F.3d at 990). "An issue of material fact is genuine if a reasonable jury could return a verdict for the non-movant." *Id.*

Plaintiff asserts several claims in his complaint: (1) that Defendant discriminated against him because of his race, national origin or religion; (2) harassment based upon his race, national origin or religion; (3) retaliation; (4) intentional infliction of emotional distress; and (5) breach of the covenant of good faith and fair dealing.  The court addresses each of these claims in turn.

## I. Claims of Discrimination Under Title VII and the Utah Antidiscrimination Act

Plaintiff claims that Defendant discriminated against him because of his race, national origin or religion.  It appears that Plaintiff may also be asserting a claim for harassment based upon his race, national origin and religion.[2]  Defendant moves for

---

[2]In his complaint, Plaintiff's first cause of action is for "National Origin, Race and Religious Discrimination."  In paragraph 24 of his complaint, Plaintiff complains that "[s]uch actions and decisions constitute discrimination against Plaintiff in violation of Utah Code Ann. § 34A-5-106, as well as Title

summary judgment on these claims arguing that Plaintiff's claims fail for several reasons.

To establish a prima facie case of discrimination under Title VII and the Utah Antidiscrimination Act,[3] Plaintiff must demonstrate that (1) he is a member of a protected class; (2) he was qualified for the position of Assistant Manager; (3) he was not promoted despite his qualifications; and (4) the position was filled or remained open after he was not promoted. *See Jaramillo v. Colorado Judicial Dep't*, 427 F.3d 1303, 1306-07 (10th Cir. 2005).  Plaintiff must raise a genuine issue of material fact on each of these elements to make this showing.  *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 937 (10th Cir. 2005).  After examining the record, the court concludes that Plaintiff cannot establish a prima facie case of race, national origin or religious discrimination under this test because Defendant has

---

VII . . ."  (Doc. 2, at ¶ 24 (emphasis added).)  Plaintiff later claims, in paragraph 27, that Defendant "failed to respond in a way reasonably calculated to stop the discrimination *and harassment*."  (Doc. 2, at ¶ 27 (emphasis added).)

[3]Plaintiff purports to bring his discrimination claims under Title VII and the Utah Antidiscrimination Act, and Defendant moves for summary judgment on Plaintiff's discrimination (and harassment) claims under Title VII and the Utah Antidiscrimination Act.  Because the prima facie elements and analysis under state statutory law are identical to analysis under Title VII, the court simultaneously analyzes Plaintiff's federal and state discrimination claims, and then harassment claims.  *See Viktron/Lika v. Labor Comm'n*, 38 P.3d 993, 995 (Utah Ct. App. 2001).

shown that Plaintiff was not qualified for the position of Assistant Manager.

As set forth above, Plaintiff completed his classroom work with extended individualized training with Tanner.  At the time, Tanner noted that Plaintiff had a tendency to "stand back" and not participate.  Tanner noted in her appraisal that Plaintiff needed to take initiative and be more pro-active and acquire knowledge regarding basic functions, such as learning the Telxon and handling cash.

Also as set forth above, once Plaintiff completed his classroom work, Plaintiff transferred to the Perry, Utah Wal-Mart store and was assigned to "job shadow" Assistant Manager Jones for approximately four weeks.  During this time, Jones noted that Plaintiff was unable to perform the most basic responsibilities, such as operating the hand-held computer called the Telxon.

It is undisputed that as an assistant manager, Plaintiff was required to use the Telxon on a daily basis for routine operations such as price checks, price changes and inventory control.  Like Tanner, Jones also noted that Plaintiff lacked the initiative and leadership skills to take over as an Assistant Manager.  According to Jones' observations, Plaintiff often stood around watching other associates perform work and failed to jump in and act as a leader.  Based upon his four weeks of observation, Jones informed Tanner and Schulthies that Plaintiff

did not possess the knowledge or leadership skills necessary to hold the position of assistant manager.

Further, it is undisputed that despite Plaintiff's inability to master the skills necessary to assume an assistant manager position during his four-week "job shadowing" training, Schulthies decided to extend Plaintiff's on-the-job training for an additional three to four weeks.  Schulthies transferred Plaintiff to the Harrisville, Utah store and assigned him to "job shadow" Assistant Manager Reddington.  Because Plaintiff was unfamiliar with the operations on the front-end, Reddington assigned Plaintiff with tasks on the front-end.  He also asked Plaintiff to come up with an action plan for handling refunds the day after Christmas.  Reddington spent almost three weeks with Plaintiff before leaving for vacation.

It is undisputed that when Reddington returned from vacation, Plaintiff had not completed his action plan as requested.  Moreover, while Reddington was on vacation, Plaintiff had run a credit card sale through as a cash transaction, which resulted in an almost $200 loss to Defendant.  Plaintiff was also unable to independently build a store display, failed to assist cashiers with cash and was unable to handle customer complaints and issues on his own.

Plaintiff does not dispute that Schulthies then met with Plaintiff, along with other managers from the Harrisville, Utah store.  During the meeting, Schulthies asked Plaintiff to explain

13

basic procedures that he should know as an assistant manager, and Plaintiff was unable to adequately explain how to do certain tasks. As a result, Schulthies offered Plaintiff another position, stating that he was not quite ready to assume the position of assistant manager.

In his deposition, Plaintiff conclusively asserts that he was qualified and Defendant tried to make him feel unqualified, which he claims is discrimination. (Doc. 44-3, Excerpts of April 30, 2009 Deposition of Bassila Marega, at 3, 6, and 9.) However, Plaintiff has presented no evidence that he was qualified for the job or that the feedback Jones, Reddington, Flint and McKuen provided regarding Plaintiff's performance was inaccurate. Plaintiff asserts that the fact that he is now an assistant manager at another store is evidence enough to show that he was qualified to be an assistant manager for Defendant at the time in question; however, this assertion does not adequately rebut the overwhelming evidence presented by Defendant that, at the time in question, Tanner, Jones, Reddington, Flint and McKuen consistently observed that Plaintiff failed to show the initiative and leadership skills, as well as the basic understanding of his job duties, to work independently as an assistant manager. Plaintiff has failed to establish the second element of his prima facie case that he was qualified to work independently as an assistant manager. As a result, Plaintiff cannot establish his race, national origin or religious

14

discrimination claims and, accordingly, the court recommends that those claims be dismissed and Defendant's summary judgment as to these claims be granted.

In addition to Plaintiff's failure to establish a prima facie case of discrimination, summary judgment may also be granted based on Defendant's articulation of a legitimate, non-discriminatory reason for its decision to offer Plaintiff a position other than assistant manager.  Assuming Plaintiff had established a prima face case, which the court concludes he has not, the burden would then shift to Defendant to assert a legitimate, nondiscriminatory reason for its employment decision. *Sanchez v. Denver Public Schools*, 164 F.3d 527, 531 (10th Cir. 1998).  Once Defendant is able to present such a reason, Plaintiff may resist summary judgment only if he can present evidence that the proffered reason was pretextual, or unworthy of belief.  *See id.; see also Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (to show pretext plaintiff must present facts that proffered reasons are "so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief"); *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1998) (providing that "mere conjecture that [the] explanation is pretext for intentional discrimination" is not enough to deny summary judgment).

In this case, as described in detail above, Defendant has set forth evidence that Plaintiff was not qualified to be assistant manager.  Tanner, Jones, Reddington and Flint observed Plaintiff lacked initiative and leadership skills while on the sales floor.  Moreover, Plaintiff did not master certain skills, such as operating the Telxon or cash register, which was required for an assistant manager.  Plaintiff was unable to explain basic procedures and processes to Schulthies.  This reason for Defendant's decision not to hire Plaintiff to be an assistant manager (that Plaintiff was not qualified) is a legitimate, nondiscriminatory reason.  Thus, Plaintiff is now required to present evidence that Defendant's reason for not offering him the assistant manager position was pretextual.  Defendant has not made such a showing.

In his deposition, Plaintiff claims that approximately four weeks after he started in the MTP at Wal-Mart, Jeri Goulden, the store manager at the Harrisville, Utah Wal-Mart store, allegedly told him on one occasion that she did not like "black people." (Doc. 44-3, at 4.)  Other than Goulden's alleged statement, Plaintiff testified that no one made any comments about his race and/or religion.[4]  (Doc. 44-3, at 7-8.)  Although Goulden was the

_____

[4]Plaintiff testified that another associate, Sunshine Bradley told him that she did not understand him because of his accent.  (Doc. 44-2, at 25-26.)  Bradley's observation cannot be fairly characterized as discriminatory.

store manager for the Harrisville Wal-Mart store, she did not train Plaintiff and he was not assigned to "job shadow" her.

Moreover, Plaintiff transferred to an entirely different store and was assigned to Jones — who is completely unrelated to Goulden — in the Perry, Utah store.  It is undisputed that based upon his own independent observation, Jones informed Tanner and Schulthies (not Goulden) that Plaintiff was not prepared to assume the assistant manager position.  Jones, Reddington and Flint provided feedback to Tanner and Schulthies (not Goulden). Schulthies met with Plaintiff and determined that he was not ready to assume the position of assistant manager and, therefore, offered him the position of customer service manager.  Thus, Goulden's alleged comment is no more than an isolated comment unrelated to Plaintiff's training or Defendant's employment decision.  *See, e.g., Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1140 (10th Cir.) (holding that comment about employee's age was too isolated or ambiguous to support an inference of discrimination), *cert. denied* 531 U.S. 876 (2000); *Cone v. Longmont United Hosp. Ass'n.*, 14 F.3d 526, 531 (10th Cir. 1994) (holding that isolated comments unrelated to challenged decision are insufficient to show discriminatory animus); *Newsome v. McKesson*, 932 F.Supp. 1339, (D. Utah 1996) (concluding that supervisor's single statement that she only wanted men in computer room insufficient to be actionable gender discrimination under Title VII).  As the court in *Stone* noted, a "plaintiff must

demonstrate a nexus exists between the allegedly discriminatory statement and the company's termination decision." *Stone*, 210 F.3d at 1140.  In this case, Plaintiff cannot show such a nexus between Goulden's alleged stray remark at week four of his training and Schulthies' ultimate decision approximately sixteen weeks later not to place Plaintiff in the position of assistant manager.  Plaintiff alleges Goulden made this remark shortly after he began the MTP in the Harrisville store.  Over the next sixteen weeks, Plaintiff worked in another store, job shadowed another manager and makes no allegation that Goulden made any other remarks to him regarding his race or national origin (or religion).  When comments are vague and remote in time, they are insufficient to establish discrimination.  *See, e.g., Jones v. Overnite Trans. Co.*, 2006 WL 3627148 at *273-74 (5th Cir. 2006) (determining supervisor's comment to "get rid of all the blacks" and "fire a bunch of n_____" made four months prior to termination too vague and remote to establish discrimination). Consequently, the court concludes that Plaintiff's discrimination claims should be dismissed because Defendant has established a legitimate, non-discriminatory reason for not offering Plaintiff an assistant manager position.

Furthermore, the court concludes that summary judgment also should be granted because Plaintiff has not presented any evidence to support a hostile work environment claim under Title VII.  Title VII proscribes employment practices that permeate the

18

workplace with "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted).  In determining whether a hostile work environment existed, the court may consider the conduct's frequency and severity, whether it was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with Plaintiff's work performance.  *See Harsco Corp. v. Renner*, 475 F.3d 1179, 1187 (10th Cir. 2007).

To fulfill his burden, Plaintiff must show more than "a few isolated incidents of racial enmity." *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir.), *cert. denied* 525 U.S. 881 (1998).  In *Witt*, the plaintiff was an African-American employee for Roadway Express trucking company.  Over a two-year period, plaintiff received a note on his windshield, written on letterhead of the Ku Klux Klan, saying "pay your dues, n___." *Id.* at 1428.  On another occasion, several co-workers called him a n____ and referred to his being black and needing to leave things alone with the union.  *Id.* The *Witt* court concluded that "[a]lthough socially inexcusable, [the incidents] are a few isolated incidents of racial enmity, which the law cannot redress." *Id.* at 1432 (internal quotations omitted).  As a result, the court held that "two incidents such as these in two

19

years are insufficient to establish a racially hostile work environment under the pervasiveness prong of Meritor." *Id.* The court also concluded that the two incidents were not sufficiently severe to create a hostile work environment. *Id.* at 1433. The court noted that "[t]he mere utterance of a statement which 'engenders offensive feelings in an employee' would not affect the conditions of employment to [a] sufficiently significant degree to violate Title VII." *Id.* (*quoting Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

In his complaint, Plaintiff makes no factual allegation of any harassment based upon his race, national origin or religion. In his deposition, Plaintiff alleges that on one occasion, approximately four weeks after he started working for Defendant, Goulden told him that she did not like "black people." He also testified that Sunshine Bradley and some of the Trainees in the MTP told Plaintiff that they did not understand him because of his heavy accent.[5] Assuming for purposes of summary judgment that Goulden told Plaintiff she did not like "black people,"

_____

[5]In his deposition, Plaintiff testified that after he hired counsel and filed his charge of discrimination, he learned that co-manager Rositta Olsen told Tanner that Plaintiff commented to Olsen that he did not take directions from women because he was Muslim. (Doc. 44-2, at 27-28.) Presumably, Plaintiff denies he made this statement to Olsen. In any event, Plaintiff does not allege that he even knew Olsen had informed Tanner about his alleged statement until after he had resigned his employment. Thus, Olsen's statement could not, as a matter of law, make Plaintiff's working environment religiously hostile.

Goulden allegedly made this one remark shortly after Plaintiff
began his training in the MTP.  Goulden did not train Plaintiff
and did not provide feedback regarding the "job shadowing"
portion of Plaintiff's job.  Moreover, after he completed his
classroom training, Plaintiff transferred to an entirely
different store to "job shadow" Jones in the Perry, Utah store.
Plaintiff makes no allegation of any race, national origin or
religious harassment while he was employed at the Perry, Utah
store.  When Plaintiff returned to the Harrisville store several
weeks later, Plaintiff claims that no one, including Goulden,
made any remarks to him regarding his race, national origin or
religion.  As such, Plaintiff has failed to show harassment based
upon his race, national origin or religion that is sufficiently
severe or pervasive enough to permeate Plaintiff's environment.

Moreover, no reasonable jury could find Defendant liable
under Title VII because it condoned or tolerated the creation of
a racially hostile environment.  Plaintiff makes no allegation
that he complained about Goulden's alleged remark or that
Defendant knew or should have known about Goulden's alleged
remark.  As a result, there is no basis upon which to hold
Defendant liable for Goulden's alleged remark.  Accordingly, the
court concludes that, to the extent that he is asserting a
harassment claim based upon his race, national origin and
religion, such a claim should be dismissed.

21

## II.   Title VII Retaliation Claim

The court next examines Plaintiff's Title VII retaliation claim.

Exhaustion of administrative remedies is a "jurisdictional prerequisite" to suit under Title VII. *Simms v. Oklahoma*, 165 F.3d 1321, 1326 (10th Cir. 1999); *Jones v. Runyon*, 91 F.3d 1398, 1399 (10th Cir. 1996).  To exhaust administrative remedies, a plaintiff must first file a charge with the EEOC or authorized state agency (in Utah, the Utah Antidiscrimination and Labor Division ("UALD")) and receive a right-to-sue letter based on that charge.  *See Simms*, 165 F.3d at 1326. The charge tells the agency what to investigate, provides it with the opportunity to conciliate the claim and gives the charged party notice of the alleged violation.  *See Martinez v. Potter*, 347 F.3d 1208, 1211 (10th Cir. 2003).  A party's failure to mark a box for a particular type of discrimination in the charge creates a presumption that he is not asserting claims under the unmarked theories.  *See Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1260 (10th Cir. 1998).

The plaintiff in *Belcher v. Boeing Commercial Airplane Group*, for example, checked only the box for race discrimination in his EEOC charge, leaving the boxes for retaliation and disability discrimination blank.  *See Belcher*, 105 Fed. Appx 222, 227 (10th Cir. 2004).  The plaintiff later brought suit in district court for race discrimination and retaliation and

22

disability discrimination.  *Id.* at 225.  In examining whether the plaintiff had exhausted his administrative remedies with respect to the unchecked claims, the Tenth Circuit emphasized that:  (1) the plaintiff had only checked the box for race discrimination; and (2) the narrative portion of the charge was devoid of any suggestion of retaliation or disability discrimination.  *See id.* at 227; *see also Gunnell*, 152 F.3d at 1260 (looking to narrative section of charge for evidence rebutting presumption that unmarked forms of discrimination are not being asserted).  Thus, the court found that the district court correctly held that the plaintiff had failed to exhaust his administrative remedies with respect to retaliation and disability discrimination.  *See Belcher*, 105 Fed. Appx at 227; *see also Echols v. Today's Staffing*, 35 Fed. Appx 776, 777 (10th Cir. 2002) (noting that "[a]n examination of the record makes it apparent that [plaintiff's] EEOC charge provided no suggestion of a racial discrimination theory.  The district court therefore properly dismissed his federal-court action for failure to exhaust administrative remedies.").

In this case, Plaintiff filed his initial Charge of Discrimination ("Initial Charge") against Defendant with the UALD on January 5, 2006.  (*See* Doc. 44-11, Plaintiff's Initial Charge.)  In his Initial Charge, Plaintiff checked the boxes for

race, color and national origin.[6] Plaintiff did not check the box for retaliation. In the narrative section on his Initial Charge, Plaintiff made no suggestion of any retaliation. He did not allege that he ever engaged in any protected activity or launched a complaint of any kind. He did not claim that his alleged "termination" was in retaliation for any conduct.

Similarly, while represented by counsel, Plaintiff filed an Amended Charge of Discrimination ("Amended Charge") against Defendant with the UALD on March 29, 2006. (*See* Doc. 44-12, Plaintiff's Amended Charge.) In his Amended Charge, Plaintiff checked the box for religion and kept the race, color and national origin boxes checked. The narrative portion of his Amended Charge remained largely the same. He merely added one sentence that his "religious cultural habits (specifically interaction and communication with female co-employees and customers in the workplace wasn't consistent with Wal-Mart's diverse environment)." Plaintiff also added "Religion/Muslim" as one of the reasons he believes he has been discriminated against. Otherwise, Plaintiff made no other changes to his Amended Charge. He did not add any facts that would indicate that Plaintiff was asserting a retaliation claim against Defendant. Accordingly, Plaintiff has failed to exhaust his administrative remedies on

---

[6]In this lawsuit, Plaintiff asserts a discrimination claim only for race and national origin discrimination. (*See* Doc. 2, Complaint, at ¶¶ 13-34.)

his retaliation claim.  As a result, the court concludes that it lacks jurisdiction to consider this claim and must dismiss it as a matter of law.

### III.  Intentional Infliction of Emotional Distress Claim

The court next examines Plaintiff's intentional infliction of emotional distress claim.

The Utah Workers' Compensation Act (the "Act") provides that compensation awarded under the Act is "exclusive" and the "liabilities of the employer imposed by this chapter is *in place of any and all other civil liability whatsoever*, at common law or otherwise[.]"  Utah Code Ann. § 34A-2-105(1) (2008) (emphasis added).  The Act further provides that "an action at law may not be maintained against an employer or against any officer, agent, or employee of the employer based upon any accident, injury, or death of an employee."  *Id.*  The Act is designed to address physical and mental injuries on the job.  *Retherford v. AT&T Communications*, 844 P.2d 949, 965 (Utah 1992); *Mounteer v. Utah Power & Light Co.*, 823 P.2d 1055, 1057 (Utah 1991).  Mental injury is a necessary element of an intentional infliction of emotional distress claim.  *Retherford*, 844 P.2d at 965; *Mounteer*, 823 P.2d at 1059.  As a result, the Act provides the exclusive remedy for a plaintiff's intentional infliction of emotional distress claim.  *Retherford*, 844 P.2d at 965.  Damages arising

from any emotional distress can be compensated only under the Act. *Mounteer*, 823 P.2d at 1058.

In this case, Plaintiff's intentional infliction of emotional distress claim seeks damages for mental injuries arising on the job.[7] Plaintiff fails to specify, however, the alleged conduct which he claims caused his emotional distress. In any event, because mental injury is covered by the Act, the Act provides Plaintiff "the exclusive remedy for [his] mental distress." *Retherford*, 844 P.2d at 965.

In addition, Plaintiff fails to allege in his complaint that Defendant's conduct, which caused his alleged emotional distress, was intentional and deliberate. Thus, Plaintiff's claim for intentional infliction of emotional distress is insufficient to sustain the claim under the intentional conduct exception because Plaintiff has not established that Defendant acted with "a conscious and deliberate intent directed to the purpose of inflicting an injury." *See Lantz v. National Semiconductor Corp.,* 775 P.2d 937, 939-40 (Utah Ct. App. 1989). As a result,

---

[7]In his complaint, Plaintiff actually alleges that he has suffered "emotional, physical and bodily injuries." (Doc. 2, at ¶ 43.) However, in his complaint and in his deposition, Plaintiff failed to allege any facts demonstrating that he suffered any bodily or physical injuries. For example, in his deposition, when asked the basis of his intentional infliction of emotional distress claim, Plaintiff testified "Okay. Since they fire me, that really bother me a lot." (Doc. 44-2, at 30.) Plaintiff went on to admit that Defendant did not really fire him, but offered him a position other than assistant manager. (Doc. 44-2, at 31-32.)

the court concludes that Plaintiff's intentional infliction of emotional distress claim is barred by the Act's exclusivity provision and recommends that it be dismissed.

Furthermore, the court concludes that Defendant's conduct was not outrageous.  Defendant has established that it provided Plaintiff with individualized instruction and extended training, but Plaintiff failed to demonstrate the leadership qualities and skills necessary for an Assistant Manager position.  Nonetheless, Defendant offered Plaintiff another position with Defendant; however, Plaintiff voluntarily resigned his employment with Defendant.

Under Utah law, to succeed in an action for infliction of emotional distress, a plaintiff must prove the following elements: "(1) outrageous conduct by the defendant; (2) the defendant's intent to cause, or the reckless disregard of the probability of causing, emotional distress; (3) severe emotional distress; and (4) an actual and proximate causal link between the tortious conduct and the emotional distress."  *White v. Blackburn*, 787 P.2d 1315, 1317 (Utah Ct. App. 1990).  "Due to the highly subjective and volatile nature of emotional distress and the variability of its causations, the courts have historically been wary of dangers in opening the door to recovery therefore."  *Bennett v. Jones, Waldo, Holbrook & McDonough*, 70 P.3d 17, 30 (Utah 2003) (citations and internal quotation marks omitted).  If the court determines that "a defendant's conduct was not

27

outrageous as a matter of law, then the plaintiff's claim fails, and a court may properly grant the defendant summary judgment on an intentional infliction of emotional distress claim.'' *Prince v. Bear River Mut. Ins. Co.*, 56 P.3d 524, 536 (Utah 2002) (citations omitted).

The court concludes that in this case, Plaintiff has not shown that Defendant's alleged conduct was outrageous. Under Utah law, conduct is outrageous if it is "atrocious" and so "extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Amos v. Corporation of Presiding Bishop*, 594 F. Supp. 791, 831 (D. Utah 1984), *rev'd on other grounds*, 483 U.S. 327 (1987) (citing *Restatement (Second) of Torts*, § 46, cmt. d (1965)). In the employment context, "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" do not rise to the level of extreme and outrageous conduct necessary for a claim for intentional infliction of emotional distress. *Restatement (Second) of Torts*, § 46 cmt. d.[8] *Cf. Robertson v. Utah Fuel Co.*, 889 P.2d 1382, 1388-89 (Utah Ct. App. 1995) (requiring employee to discuss drug addiction with subordinates and then later discharging insufficient to show outrageous conduct), *cert. denied*, 899 P.2d

---

[8]In *Retherford*, the Utah Supreme Court confirmed that Utah law follows the approach of the *Restatement (Second) of Torts*. *Retherford*, 844 P.2d at 978, n.19.

1231 (1995); *Dubois v. Grand Central*, 872 P.2d 1073, 1078 (Utah Ct. App. 1994) (mere fact of employee's discharge, coupled with fact that discharge may have been based on incorrect information, does not rise to level of outrageous or intolerable conduct necessary to establish prima facie claim of emotional distress); *Howcroft v. Mountain States Tel. and Tel. Co.*, 712 F. Supp. 1514, 1521-22 (D. Utah 1989) (dissuading potential employers from hiring terminated employee insufficient to show outrageous conduct when employee fired for misuse of company credit card); *Sperber v. Galigher Ash Co.*, 747 P.2d 1025, 1028-29 (Utah 1987) (lying to employee about reasons for termination insufficient to show outrageous conduct); *Amos*, 594 F.Supp. at 830-31 (conducting intensely personal interviews which require answers to questions about employee's sexuality, moral purity, and income contribution to the employer's church insufficient to constitute outrageous conduct).

In this case, it is undisputed that Defendant allowed Plaintiff to come to class five hours late three days a week, and then provided him with individualized makeup instruction, so he could continue his course work at Utah State.  It is further undisputed that when Plaintiff failed the hands-on, "job shadowing" portion of his training, Defendant provided Plaintiff with an extended training period with a new assistant manager in a new store.  At the conclusion of his extended training program, when Plaintiff continued to show a lack of leadership, initiative

and understanding of essential assistant manager duties,
Defendant offered Plaintiff a job in his hometown at the Logan,
Utah store.[9]   Plaintiff, however, rejected Defendant's offer and
voluntarily resigned his position with Defendant.[10]

The court concludes that Defendant's conduct was not
atrocious and intolerable.  Defendant even provided
individualized instruction and extending training, then offered
Plaintiff another position.  This conduct certainly is not "'so
extreme and outrageous as to permit recovery.'"  As a result, the
court concludes that Defendant's actions were not outrageous and
recommends that Plaintiff's intentional infliction of emotional
distress claim be dismissed.

_____

[9]According to Defendant, Schulthies, the assistant manager,
also told Plaintiff he would continue to look for a job for
Plaintiff that would involve computers and information systems so
that Plaintiff could work for Defendant in his degree specialty.
Although Plaintiff told the court at oral arguments that he does
not remember this offer being extended to him, Plaintiff
discussed Schulthies' offer to do so in his deposition.  (Doc.
44-2, at 31.)

[10]Plaintiff does not allege, nor could the facts of this case
support, a claim of constructive discharge.  *See, e.g., Touchard
v. La-Z-Boy Inc.,* 148 P.3d 945, 954-55 (Utah 2006) (establishing
that constructive discharge requires working conditions so
intolerable that a reasonable employee would feel compelled to
resign).  However, even assuming that Defendant's offer of
another position is somehow viewed as termination, even this
conduct does not rise to the level of "outrageousness" required
to sustain Plaintiff's intentional infliction of emotional
distress claim.  *See Dubois*, 872 P.2d at 1078 (mere fact of
discharge does not rise to level of outrageous conduct).

### IV. Breach of the Covenant of Good Faith and Fair Dealing Claim

Finally, the court turns to Plaintiff's claim of breach of the covenant of good faith and fair dealing.

The implied covenant of good faith and fair dealing depends upon the existence of an underlying contractual relationship. *See Cannon v. Travelers Indem. Co.*, 994 P.2d 824, 828 (Utah Ct. App. 2000) ("The [implied covenant of good faith and fair dealing] is created by the contract between the parties."); *see also Elliott Indus. Ltc. v. BP Am. Prod. Co.*, 407 F.3d 1091, 1114 (10th Cir. 2005) ("The implied covenant of good faith and fair dealing depends upon the existence of an underlying contractual relationship.") (applying New Mexico law) (citation omitted). In this case, it is undisputed that Plaintiff was an at-will employee.  In his complaint, Plaintiff merely alleges that "Defendant's actions constitute a breach of the implied covenant of good faith and fair dealing."  (Doc. 2, at ¶ 46.)  He makes no allegation of any underlying contract between Plaintiff and Defendant.  He also fails to make any allegation regarding the specific actions that Plaintiff claims constitute a breach of the covenant of good faith and fair dealing.

In his deposition, Plaintiff admitted that Defendant offered him a job and gave him the Offer Letter, which specifically stated "[t]his letter is not a contract, and your employment with

31

the Company will be completely at-will." (Doc. 44-2, at 34-35.) He also testified that no one from Wal-Mart made any promise to him that is the basis for his breach of the covenant of good faith and fair dealing claim. (Doc. 44-2, at 36.) Plaintiff testified that he completely understood that he was being hired merely to participate in Defendant's MTP and that he would have to successfully complete the classwork and training program before he would become an assistant manager for Defendant. (Doc. 44-2, at 7, 33.)

As a result, the court concludes that Plaintiff has failed to establish that there was any underlying contractual relationship between him and Defendant. Because the implied covenant of good faith and fair dealing depends upon the existence of an underlying contractual relationship, which indisputably does not exist in this case, Plaintiff's claim should be dismissed.

Finally, the court notes that Plaintiff has not identified any John or Jane Does. As a result, the court concludes that the entire complaint should be dismissed.

### RECOMMENDATION

Based on the above analysis, **IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment (Doc. 43) be **GRANTED.  IT IS FURTHER RECOMMENDED** that the entire complaint be dismissed because Plaintiff has not identified any John or Jane Does.

32

Copies of this report and recommendation are being sent to the parties who are hereby notified of their right to object to the same.  The parties must file any objections to the report and recommendation, pursuant to 28 U.S.C. § 636(b), within fourteen (14) days after receiving it.  Failure to file objections may constitute a waiver of those objections on subsequent appellate review.

DATED this 2nd day of February, 2010.

BY THE COURT:

_____
SAMUEL ALBA
United States Magistrate Judge